UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM GIBSON,  :  |  |
|     Plaintiff,  :  |  |
| :  |  |
| v.  :  | CASE NO. 3:20-cv-953 (KAD) |
| :  |  |
| RODRIGUEZ, et al.,  :  |  |
|     Defendants.  :  |  |

**MEMORANDUM OF DECISION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 42]**

Kari A. Dooley, United States District Judge

    The plaintiff, William Gibson ("Gibson"), commenced this civil rights action on July 9, 2020. Following initial review and the Court's ruling on the defendants' motions to dismiss, the remaining claims are an Eighth Amendment conditions of confinement claim against defendants Rodriguez, Hines, Thibeault, Moore, Wright, and Kennedy and an Eighth Amendment deliberate indifference to medical needs claim against defendants Wright and Kennedy. Pending before the Court is the defendants' motion for summary judgment. Therein, the defendants argue that Gibson failed to exhaust his administrative remedies on any claim for relief, Gibson cannot establish the elements of either claim, and the defendants are protected by qualified immunity. Gibson filed an opposition to the motion. For the following reasons, the motion is GRANTED.

**Standard of Review**

    A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense …." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts[1]**

This action concerns Gibson's conditions of confinement and medical treatment at Osborn Correctional Institution ("Osborn") during the COVID-19 pandemic in March, April, and May 2020. Defs.' Local Rule 56(a)1 Statement, Doc. No. 42-2, ¶ 3. During that period, defendants Thibeault and Hines were Deputy Wardens, Rodriguez was the Warden, Moore was a Counselor Supervisor, Dr. Wright worked at Osborn, and Dr. Kennedy was the Department of Correction's Chief Medical Officer. *Id.* ¶ 8.

On March 13, 2020, Osborn implemented a facility lockdown in response to the COVID-19 pandemic to limit the spread of the virus. *Id.* ¶ 9. Osborn staff followed the instructions and recommendations from the Department of Correction's Central Office, including those of the Chief Medical Officer, and from the Osborn medical staff, to implement procedures and protocols to protect against the spread of the virus. *Id.* ¶ 10. Many of these procedures and protocols were from the CDC's recommendations for correctional facilities. *Id.* The procedures included reducing population density within the Department of Correction through community release, suspending visits and group programming to limit inmate contacts, and suspending showers and phone use in cell blocks under quarantine per medical instructions to limit the

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.

The defendants informed Gibson of this requirement. *See* Notice to Self-Represented Litigant Concerning Motion for Summary Judgment, Doc. No. 42-3. However, only some of Gibson's denials are supported by the required citations. Accordingly, those statements to which the denial is not supported by citation to admissible evidence are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").

spread of the virus in the showers and by using the phones. *Id.* ¶ 11. Inmates were provided instruction on social distancing when possible, frequent hand washing, and reporting COVID-19 symptoms. *Id.* ¶ 12.

As of April 6, 2020, inmates at Osborn had been given at least two masks. *Id.* ¶ 13. Staff also were provided masks and both inmates and staff were required to wear masks at all times while in Osborn. *Id.* ¶ 14. Prior to entering Osborn for their shifts, staff underwent COVID-19 screening, which included a temperature check and questions regarding symptoms. *Id.* ¶ 15. Staff with a fever or exhibiting symptoms were denied entry. *Id.*

Inmates were provided free bars of soap for hand washing and cleaning, common areas were cleaned and disinfected regularly and more frequently than before the pandemic. *Id.* ¶ 16. This cleaning included a daily deep cleaning for each unit, cleaning the showers after each use, and spraying the walls daily. *Id.* Inmate sleeping areas were cleaned regularly and inmates were provided cleaning solution and paper towels to disinfect their personal areas.[2] *Id.* ¶ 17.

Osborn implemented protocols for inmates testing positive for COVID-19 or displaying symptoms of the virus. *Id.* ¶ 18. An inmate displaying symptoms was sent to the medical unit to be tested. *Id.* ¶ 19. Pending the test results, the inmate and his cellmate could be quarantined in F-Block for fourteen days. *Id.* If the inmate tested positive, he was isolated in the Hospital 2 unit until he could be transferred to the COVID-19 unit at Northern Correctional Institution. *Id.* ¶ 20.

On May 13, 2020, the Department of Correction conducted the first round of mass testing

---

[2] Gibson disputes whether and when inmates received the items and whether the cleaning was more than the usual pre-pandemic cleaning but cites no evidence supporting his denials.

of inmates for COVID-19. *Id.* ¶ 21. Under the direction of department and facility medical staff, Osborn designated housing units for inmates testing positive, inmates testing negative, and inmates whose status could not be determined either because they refused testing or test results were inconclusive. *Id.* B-Block was designated for inmates who tested positive but were asymptomatic, while symptomatic inmates were sent to Northern. *Id.* ¶ 22.

Throughout the pandemic, Osborn officials were in communication with department health staff for updated information and guidance including updated recommendations from the CDC for correctional facilities. *Id.* ¶ 25. All recommended procedures were implemented, and staff was compliant with the mask requirement and screening procedures. *Id.* ¶ 26. Correctional officials, including Deputy Warden Thibeault, did not observe, and were not made aware of, any widespread non-compliance with procedures. *Id.* ¶ 27.

Between March 7, 2020 and May 15, 2020, Gibson was housed in C-Block. *Id.* ¶ 28. On May 13, 2020, Gibson took a COVID-19 test. *Id.* ¶ 29. On May 15, 2020, the test came back positive. *Id.* ¶ 30. Because Gibson was asymptomatic,[3] he was moved to B-Block, the housing unit designated for positive but asymptomatic inmates. *Id.* ¶¶ 30-31.

Gibson remained in B-Block under quarantine for fourteen days, undergoing regular COVID-19 assessments. *Id.* ¶¶ 32-33. During the May 14, 2020 assessment, Gibson denied present symptoms,[4] did not have a cough or shortness of breath, and had vital signs within normal limits. *Id.* ¶ 34. On May 15, 2020, Gibson again denied symptoms and had normal vital

---

[3] Gibson states that he exhibited COVID-19 symptoms before Osborn conducted mass testing, including loss of taste and smell, chills, cough, and body aches. Doc. No. 55 at 5 ¶ 30. However, he does not indicate that he told any medical staff about his symptoms when they occurred and does not state that he still had symptoms on May 15, 2020.

[4] Gibson states that he reported having lost his senses of taste and smell earlier but was regaining them.

signs.[5]  *Id.* ¶ 35.  Gibson was checked daily between May 16, 2020 and May 27, 2020, except on May 24, 2020, with no reported symptoms of COVID-19 and normal vital signs each day.  *Id.* ¶¶ 36-46.  On May 27, 2020, the nurse noted a caffeine-related headache and notified nursing staff.  Doc. No. 53 at 19.

Dr. Wright did not meet with Gibson or provide him medical care in May 2020.  *Id.* ¶ 49.  Dr. Kennedy was never assigned to Osborn and did not provide direct medical care to inmates.  *Id.* ¶ 50.

Inmates at Osborn had access to information about the administrative remedy procedures and health services review procedures.  *Id.* ¶¶ 65, 82.  The facility grievance log shows no grievances or grievance appeals filed by Gibson from March 1, 2020 through July 31, 2020.  *Id.* ¶¶ 70-71.  Osborn records show that Gibson did not file a health services review in May, June, or July 2020.  *Id.* ¶ 86.

**Discussion**

There are two remaining claims -- unconstitutional conditions of confinement and deliberate indifference to medical needs.  Gibson alleges that he was subjected to unconstitutional conditions of confinement because the defendants failed to comply with state recommendations regarding the pandemic.  Specifically, he contends that correctional staff did not wear masks or have their temperatures taken before each shift, no cleaning supplies were provided, inmates testing positive were housed in the same unit as those who did not have the virus, and medical equipment was not cleaned between uses.  He also contends that he was denied showers while the housing unit was under quarantine.  In his second claim, Gibson

---

[5] Gibson states that he complained of a severe headache and requested medication, but the medical record he submits does not support his statement.

challenges his medical treatment.  He contends that he was told the virus had to "run its course" and was provided no treatment after he contracted COVID-19.  The defendants move for summary judgment on three grounds, the failure to exhaust administrative remedies, the failure state cognizable claims for relief, and qualified immunity.

**Exhaustion of Administrative Remedies**

The defendants first argue that Gibson failed to properly exhaust his administrative remedies regarding any claim before filing this action.

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case.  *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 1174, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion"; the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly").  "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court."  *Amador*, 655 F.3d at 96;

*see also Jones*, 549 U.S. at 211.

There is no "special circumstances" exception to the exhaustion requirement and an inmate's failure to exhaust administrative remedies is excusable only if administrative remedies are in fact unavailable. *See Ross*, 136 S. Ct. at 1858. "[A]vailability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. "[T]he three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) but are illustrative. *See Mena v. City of New York*, No. 13-CV-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense on which the defendants bear the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendants establish that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under

8

*Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

Here, the Court does not set forth the requirements for exhaustion under Department of Correction Administrative Directives, because Gibson has raised a genuine issue of material fact as to whether those procedures were available to him, as contemplated under *Ross*. Although the Defendants have established that Gibson did not file any grievances or Health Service Reviews regarding the issues for which he now seeks redress, Gibson contends that administrative remedies were not available to him. He states that the Osborn Handbook specifically describes the location of the locked boxes into which grievances and HSRs must be placed and contends that he did not have access to either box while his unit was on lockdown. Although the defendants assert that Gibson could have given a grievance or HSR to a correctional official to be put in the box, Gibson states that neither the handbook nor the directives include that option and do not address how grievances or HSRs are to be filed during a lockdown. The court cannot resolve this issue on summary judgment.

**Conditions of Confinement**

Gibson asserts an Eighth Amendment challenge to the conditions of his confinement arguing that the defendants made insufficient efforts to implement procedures to address COVID-19 and ensure that the procedures they did implement were followed.

To state an Eighth Amendment claim for unconstitutional conditions of confinement,

Gibson must allege facts supporting an objective element—that "the deprivation was sufficiently serious that he was denied the minimal civilized levels of life's necessities"—and a subjective element—that the defendant "acted with a sufficiently culpable state of mind, such as deliberate indifferent to inmate health or safety." *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (summary order) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted)).  To satisfy the subjective component of the deliberate indifference test, Gibson must allege that the defendants knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (defendant must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and … dr[e]w that inference").  Negligent conduct does not meet this standard.  *Farmer*, 511 U.S. at 835. Further, even prison officials "who actually knew of a substantial risk to inmate health or safety may be found free of liability if they responded reasonably to the risk, even if the harm was ultimately not averted." *Id.* at 844.  Thus, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause." *Id.* at 845.

Under the objective component, there is no "bright line test" to determine whether a risk of serious harm is "substantial" for Eighth Amendment purposes. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019).   The court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," *i.e.*, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25,

36 (1993) (emphasis in original).  The court makes that determination in light of the steps the facility has already taken to mitigate the danger.  *Id.*

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."  *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).  Courts have found that "an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus."  *Chun v. Edge*, 465 F. Supp. 3d 168 (E.D.N.Y. 2020) (citing cases).  Thus, the relevant inquiry is whether Gibson has presented evidence showing conditions posing a substantial risk of serious harm after considering the procedures the defendants put in place at Osborn.  *Id.* at 201 (citing *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)).

The defendants have submitted evidence that they instituted procedures in accordance with the Department of Correction Central Office and medical staff that conformed to the CDC recommendations for correctional facilities.  Those procedures included mandatory masks for inmates and staff, screening of staff before entry to the facility, restricted inmate movement and contact, more frequent and more thorough cleaning, providing soap for frequent hand washing, information on social distancing where possible, and quarantine for inmates who had contracted or were suspected of having contracted the virus.  These procedures were updated as more information became available, and the CDC guidelines changed.  Gibson offers no admissible evidence that these procedures were not put in place at Osborne.

Although the Second Circuit has not yet addressed whether the objective component of the deliberate indifference test is met when prison officials have taken such protective measures to address the COVID-19 pandemic, courts in other jurisdictions have held that it is not.  *See,*

*e.g.*, *Valentine*, 956 F.3d at 801-02 ("after accounting for protective measures [prison] has taken[,]" which included access to soap, masks, regular cleaning, education, and quarantine procedures, "Plaintiffs have not shown a 'substantial risk of serious harm' that amounts to 'cruel and unusual punishment'"); *Toure v. Huron*, No. SA-20-CV-1036(JKP), 2021 WL 75698 at *4 (W.D. Tex. Jan. 8, 2021) ("Given [prison officials'] adherence to CDC guidelines, [prisoner] fails to demonstrate that his conditions of confinement are unconstitutional."). The court is persuaded by the reasoning of these cases and concludes that following the CDC guidelines is sufficient to negate any finding that Gibson was subjected to conditions posing a substantial risk of serious harm.

But should this determination be incorrect, the Court concludes that Gibson cannot establish the requisite *mens rea* of a deliberate indifference claim. Indeed, courts within this circuit have consistently held that prison officials did not disregard a substantial risk to inmate health and safety by implementing measures in accordance with CDC guidelines. *See Carolina v. Feder*, No. 3:20-cv-658(SRU). 2021 WL 268854 at *8 (D. Conn. Jan. 26, 2021) ("In normal times, courts must 'accord substantial deference to the professional judgment of prison' officials on matters of prison administration … [and] [i]n attempting to prevent and stem COVID-19 outbreaks, prison officials are plainly entitled to that substantial deference.") (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)), *reconsideration denied*, 2021 WL 723534 (D. Conn. Feb. 24, 2021); *see also Chun*, 465 F. Supp. 3d at 172 ("[T]he facility's aggressive response to a public health emergency with no preexisting playbook belies the suggestion that these apparent deficiencies are the product of deliberate indifference on the part of prison officials."); *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 352 (S.D.N.Y. 2020) (in denying

motion for preliminary injunction, court concluded that prison officials knew of the risk COVID-19 posed in prisons but did not disregard those risks as they took reasonable measures to abate the risk to inmates). Courts in other circuits concur. *See, e.g., Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) ("the BOP has 'responded reasonably to the risk'" of COVID-19 by implementing detailed protective measures "and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights"); *Valentine*, 956 F.3d at 802 (prison officials not deliberately indifferent where they have "taken and continue[] to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus").

Here, the defendants established measures, in accordance with CDC guidelines to address COVID-19. In doing so, they acted reasonably and were not deliberately indifferent to Gibson's health and safety. *See Chun*, 465 F. Supp. 3d at 202-03 (the preventive measures implemented by prison officials to address COVID-19 "belie any suggestion that prison officials 'have turned the kind of blind eye and deaf ear to a known problem that would indicate' deliberate indifference) (quoting *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1132 (N.D. Ill. 2020). That Gibson ultimately contracted the virus does not alter that determination. *See Farmer*, 511 U.S. at 844 (prison official who acted reasonably is not liable even if the harm was ultimately not averted). The defendants' motion for summary judgment is granted as to any claim that the defendants were deliberately indifferent to the risk posed by COVID-19.

Gibson also contends that correctional staff in his housing unit did not follow the protocols and procedures described above. The staff in his housing unit, however, are not defendants in this case. The defendants are all supervisory officials. The Second Circuit has

recently clarified the standard to be applied to a claim of supervisory liability. *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). In *Tangreti*, the Second Circuit held that, "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution."' *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Thus, Gibson must present evidence showing that the defendants were personally aware of and disregarded the failure of correctional staff in his housing unit to comply with the procedures and protocols put in place at Osborne.

In this vein, Gibson submitted copies of Inmate Requests addressed to Deputy Warden Thibeault and Warden Rodriguez and their responses. Pl.'s Mem. Ex. I & J, Doc. 53-1 at 36-41. These requests, however, concern the denial of showers, an issue addressed *infra.*. Gibson presents no evidence that he informed any defendant that correctional staff were not wearing masks, performing additional cleaning, providing soap or cleaning supplies, or otherwise not complying with the safety protocols and procedures. Thus, he has not established a genuine issue of material fact as to whether any of the named defendants had any knowledge regarding the implementation of the safety procedures in his housing unit. *See, e.g., Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (absent evidence that "the defendants are ignoring or approving the alleged lapses in enforcement" of COVID-19 protocols, "lapses in enforcement do little to establish that the defendants were deliberately indifferent"). The defendants' motion for summary judgment is granted as to this claim.

**Denial of Showers**

Gibson also argues that the defendants violated his constitutional rights because he was

denied the ability to shower for the two weeks he was in quarantine, from April 26, 2020 through May 11, 2020, and during a second quarantine period after he tested positive, from May 15, 2020 through May 21, 2020. Gibson submits a "diary" with entries showing that he was able to shower on April 26, 2020, and then not until May 10, 2020, and unable to shower from May 15, 2020 through May 21, 2020. *See* Pl.'s Mem. Ex. H, Doc. No. 53-1 at 33-35.

The Second Circuit has held that inmates have a right to sanitary living conditions and necessary materials to maintain personal hygiene. *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013) (citing cases). On the issue presented here, the court does not write on a blank slate. Courts within the Second Circuit have held that the temporary denial of access to a shower for the two weeks an inmate is in quarantine for COVID-19 does not constitute a serious deprivation of a basic human need. *See, e.g., Pape v. Cook*, No. 3:20-cv-1324(VAB), 2021 WL 2186427, at *9 (D. Conn. May 28, 2021) (denial of shower for fourteen days while confined in quarantine cell was not deprivation of basis human need) (citing cases); *Carolina*, 2021 WL 268854, at *8 (noting that no access to a shower, hand soap, cell cleaning materials, and clean clothes and bedding during two-week quarantine were "relatively minor concerns—although surely unpleasant—[that] do not rise to the level of a constitutional violation") (citing cases).

Gibson was denied a shower while under quarantine the first time for fourteen days and the second time for seven days. The Court agrees with the cases cited above that the denial of a shower for such brief periods while under quarantine does not deprive a prisoner of a basic human need. The defendants' motion for summary judgment as to this claim is granted.

**Deliberate Indifference to Medical Needs**

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to a serious medical need, Gibson must show both that his need was serious, and that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

From an objective standpoint, the alleged condition or need must be "sufficiently serious." *Spavone*, 719 F.3d at 138. The condition must produce death, degeneration, or extreme pain. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Upon initial review, the court assumed that COVID-19 is a serious medical need. The defendants now challenge that determination, citing a case from the Eastern District of Wisconsin where an inmate who tested positive for COVID-19 and experienced symptoms of fever, headache, difficulty breathing, and diarrhea was determined not to suffer a serious medical need. *See Stevens v. Carr*, No. 20-C-1735, 2021 WL 39542, at *6 (E.D. Wis. Jan. 5, 2021)

(noting that the plaintiff's symptoms were akin to a bad cold or mild case of flu and stating: "Millions of people in the United States have suffered from these same symptoms. Most did not receive medical treatment; instead, like Stevens, they rested at home and allowed their bodies to fight the infection. And, while enduring these symptoms was no doubt unpleasant, part of the issue with this pandemic is that there are few treatments to combat COVID-19 and the ones that do exist are largely unavailable to the general population.").

Here, Gibson has presented no evidence showing that he experienced any symptoms after the positive test in May 2020, and he does not cite any authority for the proposition that an asymptomatic case of COVID-19 is a serious medical need. Thus, Gibson has not shown that he suffered from a serious medical need.

The defendants also must have been "subjectively reckless." *Spavone*, 719 F.3d at 138. They must have been actually aware of a substantial risk that plaintiff would suffer serious harm as a result of their actions or inactions. The defendants "need only be aware of the risk of harm, not intend harm. And awareness may be proven 'from the very fact that the risk was obvious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983. *See Salahuddin*, 467 F.3d at 279-80. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838.

Gibson argues that he contracted COVID-19 before the testing and was not treated. Pl.'s Reply Mem., Doc. No. 57 at 6 & Pl.'s Local Rule 56(a)2 Statement, Doc. No. 55 at 5, ¶ 30. However, he neither alleges nor provides evidence showing that he informed Drs. Wright or

17

Kennedy about his symptoms and there is no indication in his medical records that he sought treatment for COVID-19 prior to the May 2020 test.  The only reference to Dr. Wright in Gibson's medical records from Osborn is that he authorized changes to medication on May 14, 2020.  Doc. No. 41 at 120.  Those medications were existing prescriptions and do not appear to be related to COVID-19.  There is no evidence in the medical records showing that Dr. Wright ordered Gibson's COVID-19 test or received his test results and Gibson provides none.  Gibson concedes that Dr. Kennedy did not treat him and submits no evidence showing that Dr. Kennedy was aware of Gibson's test results.  Absent evidence that Drs. Wright and Kennedy were aware of Gibson's test results, they could not be aware that he would suffer significant harm in the absence of action.  As Gibson has provided no evidence to support either component of the deliberate indifference standard, his claims against Drs. Wright and Kennedy fail.  The defendants' motion for summary judgment is granted as to the claims against Drs. Wright and Kennedy for deliberate indifference to serious medical needs.

**Conclusion**

Gibson's motion to submit additional information [**Doc. No. 55**] is **GRANTED**.

Defendants' motion for summary judgment [**Doc. No. 42**] is **GRANTED**.  The Clerk is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED** this 7th day of October 2021 at Bridgeport, Connecticut.

/s/
Kari A. Dooley
United States District Judge